UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------x
                                                        :

MTS Logistics, Inc.,

                                                        :

                Plaintiff,

                                                        :

      - against -

                                                   :        **COMPLAINT**

SARAY DOKUM VE MADENI AKSAM
SANAYI TURIZM A.S.,

                                                   :

                Defendant.

                                                   :
----------------------------------------------------x

Plaintiff, MTS Logistics, Inc. ("MTS"), by its attorney Gareth W. Stewart, Esq., complaining of defendant SARAY DOKUM VE MADENI AKSAM SANAYI TURIZM A.S. ("SARAY"), respectfully alleges as follows:

## Jurisdiction & Venue

1.     The Court possesses jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1333. MTS asserts a claim under the Shipping Act, 46 U.S.C. § 41102, and jurisdiction thus lies in Admiralty.

2.     Venue is proper in this district, as stipulated in marine bill of lading as to cargo exported from the United States. Defendant SARAY has otherwise subjected itself to the jurisdiction of this Court.

## PARTIES

3.     Plaintiff MTS is a New York State corporation with principal offices at 5 West 37th Street, New York City 10018, and is a transportation

concern regulated by the Federal Maritime Commission as a non-vessel operating common carrier ("NVOCC").[1]

4.      Upon information and belief, defendant SARAY is a corporate entity domiciled in Istanbul, Republic of Turkey.

**BACKGROUND & STATEMENT OF CLAIM**

5.      Around and about February 2017, a non-party Texas corporation known as OXYDE CHEMICAL, INC. ("OXYDE") enlisted MTS to transport 65 sealed containers ("Cargo") from Houston, Texas to Istanbul, Turkey (the "Istanbul Carriage").

6.      Per protocol spotlighted in fn.1 and House B/L Section 3(a),[2] MTS issued Booking Confirmation ("BC") to OXYDE identifying Mediterranean Shipping Company (USA) Inc. ("MSC") as ocean carrier for the deep sea leg of the Cargo's journey from Texas to Turkey.

---

[1] A "non-vessel operating common carrier, or NVOCC, contracts with its customers as principal, agreeing to transport their goods on a voyage that includes an ocean leg.  An NVOCC commonly issues bills of lading to its customers in its own name, even though it does not operate the ship that will carry the goods on the ocean voyage. It buys space on the carrying ship like any other customer, receiving a bill of lading from the owner or charterer of that ship when the goods are loaded on board. It commonly consolidates goods from several different shippers into a single container, receiving a bill of lading from the ocean carrier in relation to the container as a whole."

[2] "The Merchant acknowledges that the Carrier is a non-vessel operating common carrier ('NVOCC') that neither owns nor charters oceangoing vessels, in consequence of which the Carrier will contract with an actual ocean carrier to perform the high seas leg of the Carriage under this Bill of Lading and does so as agent of the Merchant."

7.     For the Istanbul Carriage, MTS issued to OXYDE two marine bills of lading ("House B/L") whose terms are incorporated herein.

8.     The House B/L named OXYDE as shipper of the Cargo.

9.     The House B/L named the consignee as "TO ORDER."

10.     The House B/L, in the "NOTIFY" box, printed SARAY.

11.     The MTS House B/L expressed that OXYDE was owner of the Cargo or agent for whoever was the Cargo owner or entitled to possession.

12.     MTS's House B/L Section 3(b) provides:

"The Merchant acknowledges that, by the Carrier identifying the Vessel on the front side of this Bill of Lading, the Merchant knows and can determine (i) the name of the actual ocean carrier of the Goods, (ii) the terms and conditions of that ocean carrier's bill of lading and applicable tariff(s), and agrees to be bound thereby."

13.     MTS's House B/L Section 3(d) renders the Merchant "liable to the Carrier for all undertakings and responsibilities of the Merchant under this Bill of Lading, including the payment of all Charges due without deduction or set-off."

14.     MTS's House B/L Section 5(e) provides:

"Inasmuch as the Carrier acts as agent of the Merchant when contracting with the actual ocean carrier for Carriage of the Goods, the Merchant is a third-party beneficiary of the ocean-carrier's bill of lading and is thus bound by all exemptions, limitations of and exonerations from liability therein contained."

15.     MTS's House B/L Section 14(b) provides:

"The Carrier shall comply with notices, orders or directives as to the Goods from any competent government agency or port authority. If by reason of or in compliance with such notice, order or directive anything required or contemplated under this Bill of Lading is not done, or not timely done, the same shall be deemed included within the Carriage and not an unreasonable deviation."

16.     MTS's House B/L Section 14(d) provides:

"The Carrier shall be entitled to and the Merchant shall become liable to pay the Carrier all Charges on the Goods and any additional costs or expenses arising from any event enumerated in this Clause 14."

17.     For the Istanbul Carriage, MSC issued to MTS sea waybills ("Ocean B/L") listing MTS as shipper of the Cargo.

18.     For the Istanbul Carriage, MSC issued to MTS sea waybills ("Ocean B/L") listing MTS as consignee of the Cargo.

19.     Upon information and belief, whilst the MSC ocean going vessel was on route to Turkey with the Cargo, the United States government issued Redelivery Notices to the vessel to return the Cargo to Houston, Texas.

20.     The Redelivery Notices are incorporated herein.

21.     OXYDE averred in Court papers that the Redelivery Notices issued to MSC on account of suspected unlawful trans-shipment of the Cargo by the intended recipient upon arrival in Turkey.

22.     SARAY averred in Court papers that the Redelivery Notices issued to MSC on account of suspected unlawful trans-shipment of the Cargo

by the intended recipient upon arrival in Turkey.

23.     Upon later-developed information and belief from OXYDE, the intended recipient of the Cargo upon arrival in Turkey was SARAY.

24.     Upon later-developed information and belief from SARAY, the intended recipient of the Cargo upon arrival in Turkey was SARAY.

25.     SARAY has provided no information to MTS as to where it had intended to unlawfully trans-ship the Cargo.

26.     In questioning under oath at a deposition, SARAY acknowledged having transacted business with addressee in Syria.

27.     During the period in question, portions of Syria were occupied and controlled by a terror amalgam commonly regarded as "The Islamic State."

28.     Upon information and belief, after the Cargo returned to Houston, Texas, OXYDE presented to and received information from the US government on the Cargo's suspected intended unlawful trans-shipment by the SARAY entity that would have claimed the Cargo upon arrival in Turkey.

29.     Upon information and belief, at or around completion of US government inquiry into the Cargo's suspected intended unlawful trans-shipment by intended Cargo recipient now identified as SARAY, the Cargo was consignable to General Order liquidation per 19 Code of Federal Regulations Subpart A, Chapter 1, § 127.1(e).

30.     Upon information and belief, at or around the time of completion of US government inquiry into the Cargo's suspected unlawful trans-shipment by intended Cargo recipient now identified as SARAY, the Cargo was destined for General Order liquidation unless shipping charges accumulated by MSC under the Redelivery Notices were paid by Cargo shipper OXYDE.

31.     Around the time of completion of US government inquiry into the Cargo's suspected unlawful trans-shipment by intended Cargo recipient now identified as SARAY, MSC presented to MTS an invoice of roughly $1.4 Million in tariffed shipping charges that the Cargo had amassed in compliance with the Redelivery Notices (hereinafter the "Tariffed Shipping Charges").

32.     Around the time of completion of US government inquiry into the Cargo's suspected unlawful trans-shipment by intended Cargo recipient now identified as SARAY, MTS presented to OXYDE the MSC invoice of roughly $1.4 Million in Tariffed Shipping Charges.

33.     Email correspondence with MSC concerning the $1.4 Million in Tariffed Shipping Charges are incorporated herein and made a part hereof.

34.     OXYDE as Cargo shipper then enlisted MTS to negotiate and secure a reduction in the Tariffed Shipping Charges, as by law allowed to MTS.

35.     MTS and MSC eventually agreed, as allowed to common carriers, to a reduction of the $1.4 Million in Tariffed Shipping Charges to approximately $760K (the "Settlement Agreement Payment").

36.    The amount by which the Tariffed Shipping Charges was reduced is approximately $700K.

37.    MTS duly tendered to MSC the $760K Settlement Agreement Payment and thereupon forestalled the Cargo being sent to General Order liquidation while owing $1.4 Million in Tariffed Shipping Charges.

38.    Cargo shipper OXYDE does not contest the Tariffed Shipping Charges.

39.    Cargo shipper OXYDE does not contest the MTS Settlement Agreement Payment.

40.    In Court papers, defendant SARAY has averred that it does not contest the Tariffed Shipping Charges.

41.    Defendant SARAY has contested and disputed the MTS Settlement Agreement Payment.

42.    Defendant SARAY has by conduct repudiated the MTS Settlement Agreement Payment and settlement compact with MSC.

43.    Cargo owner professed, SARAY, has by conduct sought to obtain ocean transportation without payment of Tariffed Shipping Charges.

44.    Cargo owner professed, SARAY, is unlawfully seeking to obtain ocean transportation without payment of Tariffed Shipping Charges.

**COUNT I (Payment of $700K Tariffed Shipping Charges)**

45.     Plaintiff MTS repeats, reiterates and realleges ¶¶1-44 as though set forth at length herein

46.     Established law is that reduction in tariffed shipping charges is not generally countenanced (Louisville & Nashville R. Co. v. Maxwell, 237 US 94 (1915); Prince Line v. American Paper Exports, 55 F.2d 1053 (2d Cir. 1932)).

47.     Reduction in Tariffed Shipping Charges can lawfully occur only in certain specific contexts, as occurred here between MTS and MSC.

48.     MTS as carrier is legally permitted to recover Tariffed Shipping Charges even after having first agreed to a reduction.

49.     Pursuant to the MTS House B/L, the Cargo owner professed SARAY is liable for the payment of Tariffed Shipping Charges in this case amounting to approximately $700K.

**COUNT II (Reimbursement of Legal Fees)**

50.     Plaintiff MTS repeats, reiterates and realleges ¶¶1-49 as though set forth at length herein.

51.     Pursuant to the MTS House B/L, upon prevailing in this action MTS will become entitled to reimbursement of its reasonable costs and legal fees from SARAY.

52.     Plaintiff MTS incurred $6,000 in legal fees to commence this

action, and legal fees to prosecute this suit will continue to accrue in an amount and to an extent not yet susceptible to precise determination.

WHEREFORE MTS demands judgment against SARAY for $700K, as prayed, with interest, reimbursed legal fees to be determined by the Court, the costs and disbursements of this action together with such other relief as may be reasonable and just.

Dated:  New York, New York
        May 5, 2021

Respectfully submitted,

GARETH W. STEWART, ESQ.
GS 2371
29 Broadway, Floor 21
New York, New York 10006
 (212) 365-8576
garethws@gwstewart.us

Counsel for Plaintiff